[No. S030595. Feb. 28, 1994.]

HARRY LOCKLIN et al., Plaintiffs and Appellants, v.
CITY OF LAFAYETTE et al., Defendants and Respondents.

COUNSEL

Pillsbury & Wilson, Pillsbury, Wilson & Post, Pillsbury, Levinson & Mills, Philip L. Pillsbury, Jr., Goldstein & Goldstein, Burton J. Goldstein and David Collins for Plaintiffs and Appellants.

William M. Pfeiffer, Judith K. Herzberg and Megan C. Sheridan as Amici Curiae on behalf of Plaintiffs and Appellants.

Stoddard, Lepper, Falco & Schaefer, Abend, Lepper, Jacobson, Schaefer & Hughes, Gary M. Lepper, John H. Tallett, John Pound, James W. Rosenquist, Esther Low, Jospeh A. Montoya, William M. McMillan, Robert J. DeFea, Kenneth G. Nellis, Donald M. Velasco, Lucille Y. Baca, Daniel C. Murphy, Gordon, DeFraga, Watrous & Pezzaglia and Timothy J. Ryan for Defendants and Respondents.

McDonough, Holland & Allen, Mark A. Wasser, Michael V. Brady and James R. Ross as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BAXTER, J.**—Is a public entity liable in tort or inverse condemnation for damage to downstream riparian property caused by the discharge of surface waters into a natural watercourse abutting its property? The Court of Appeal held that there could be no liability.

We granted the petition of plaintiffs, owners of damaged properties, to consider whether the "natural watercourse rule" stated in *Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19 [119 P.2d 1] (*Archer*), by which the Court of Appeal believed itself bound, was properly applied in this case, and to decide whether article I, section 19 of the California Constitution[1] compels compensation for damage caused by an increased flow of streamwater that is traceable to surface water runoff from improvements on public property.

We conclude that *Archer* does not correctly state the principles presently applicable to the liability of riparian landowners. To the extent that *Archer* also held that article I, section 19 of the California Constitution did not create liability, it has been overruled by subsequent decisions of this court.

When alterations or improvements on upstream property discharge an increased volume of surface water into a natural watercourse, and the increased volume and/or velocity of the stream waters or the method of discharge into the watercourse causes downstream property damage, a public entity, as a property owner, may be liable for that damage. The test is whether, under all the circumstances, the upper landowner's conduct was reasonable. This rule of reasonableness applies to both private and public landowners, but it requires reasonable conduct on the part of downstream owners as well. This test requires consideration of the purpose for which the improvements were undertaken, the amount of surface water runoff added to the streamflow by the defendant's improvements in relation to that from development of other parts of the watershed, and the cost of mitigating measures available to both upper and downstream owners. Those costs must be balanced against the magnitude of the potential for downstream damage. If both plaintiff and defendant have acted reasonably, the natural water-course rule imposes the burden of stream-caused damage on the downstream property.

We also conclude that a governmental entity may be liable under the principles of inverse condemnation for downstream damage caused by an

---

[1]Article I, section 19: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. . . ."

Plaintiffs have not sought recovery under the Fifth Amendment to the United States Constitution in this action.

increased volume or velocity of surface waters discharged into a natural watercourse from public works or improvements on publicly owned land. It will be liable if it fails to use reasonably available, less injurious alternatives, or if it has incorporated the watercourse into a public drainage system or otherwise converted the watercourse itself into a public work. Compensation is compelled by the same constitutional principles which mandate compensation in inverse condemnation actions generally. The downstream owner may not be compelled to accept a disproportionate share of the burden of improvements undertaken for the benefit of the public at large. Because downstream riparian property is burdened by the servitude created by the natural watercourse rule, however, consistent with that rule the downstream owner must take reasonable measures to protect his property. Liability on an inverse condemnation theory will not be imposed if the owner has not done so.

Finally, because the development of any property in the watershed of a natural watercourse may add additional runoff to the stream, all of which may contribute to downstream damage, it would be unjust to impose liability on an owner for the damage attributable in part to runoff from property owned by others. Therefore, an owner who is found to have acted unreasonably, and to have thereby caused damage to downstream property, is liable only for the proportion of the damage attributable to his conduct.

Although we conclude that the Court of Appeal erred in holding that the natural watercourse rule insulated defendants from both tort and inverse condemnation liability, we shall affirm the judgment. After a review of the record we are satisfied that the court properly held that Reliez Creek, the watercourse which is the focus of this litigation, had not itself become a public improvement at the time the damage of which plaintiffs complain occurred and that no public improvements in the creekbed contributed to the damage suffered by plaintiffs. That review also satisfies us that the evidence does not support a conclusion that the damage to any plaintiff's property was the result of unreasonable conduct by any defendant in the manner in which it discharged surface water runoff into Reliez Creek, or establish that there was damage to plaintiffs' properties that could not have been prevented had they undertaken reasonable measures to protect their properties.

I

UNDERLYING FACTS

Plaintiffs are the owners of property abutting Reliez Creek in Contra Costa County. The ownership interest of each plaintiff extends to the center

of the creek and includes the creekbed and banks along the frontage of his or her property. Reliez Creek is a natural watercourse which drains a watershed of approximately 2,291 acres. It is several miles long, and runs from the hills to a confluence with Las Trampas Creek. Plaintiffs' properties lie on the final 1,500 feet before Reliez Creek joins Las Trampas Creek. Over the last 50 years development in the watershed has transformed an essentially rural environment into one in which 1,294 acres are developed. Public and private improvements in the watershed have prevented or lessened absorption of surface waters. Paving and other treatment has made some ground impervious to water, and the manner in which surface water runoff reaches Reliez Creek has been altered. The result has been an increase in the volume of surface waters discharged into Reliez Creek and in the velocity of the waters in the creek, particularly during times of heavy rains. In recent years the flow has caused scouring, undercutting, and erosion of the banks of the creek on plaintiffs' properties. The area of improvement is not limited to that owned by defendants, however. Development in the City of Walnut Creek, part of which is in the Reliez Creek watershed, and improvement on the grounds of Acalanes High School adjacent to Reliez Creek, as well as private development of other nonriparian property within the watershed, have added surface water runoff to Reliez Creek.

Plaintiffs purchased their respective properties at various times between 1965 and 1978. Many inspected the creek bank at the time they purchased their property. None observed any erosion. Although some erosion of the creek banks occurred subsequently, damage to the creek banks during the winter of 1981-1982, a period of unusually heavy rainfall, was more significant. There was evidence that the increased flow of waters led to failure of the creek banks adjacent to plaintiffs' properties, widening the creek in some locations from a width of 40 feet to a width of 110 feet. There was also evidence that the city and county were aware that the increased flow of surface waters caused by development was causing and would cause damage to the creek banks. The damage to the creekside property might have been prevented by check dams and dikes, upstream diversion structures, and retention basins. That evidence did not relate the need for such structures to the increased runoff from defendants' properties or demonstrate that it would be reasonable to impose the cost of such structures on the named defendants, whose property comprised a small percentage of the watershed.[2]

In 1983, plaintiffs filed this action to recover for "extensive landslide" damage to their properties adjacent to the Reliez Creek, damage allegedly

---

[2]Less than 7 percent of the property in the watershed is owned by defendants. Numerous other public and private entities are owners of riparian property upstream from plaintiffs.

In support of a claim that defendants were aware that development in the watershed posed a danger to downstream properties, plaintiffs introduced a 1952 study prepared by the Contra Costa County Flood Control and Water Conservation District, a study authorized by the Board of Supervisors of Contra Costa County. The study predicted increased flood hazard as

caused by defendants' storm drainage system.[3] The failure to maintain the drainage system was alleged to have "extensively eroded Plaintiffs' real property, triggering landslides which have damaged Plaintiffs' real property and which now threaten the stability of the remaining portions of Plaintiffs' real property." They sought to recover damages on theories of inverse condemnation, nuisance, dangerous condition of public property, and trespass to real property, and, in addition, they sought injunctive relief.

Named as defendants were the City of Lafayette (City), the County of Contra Costa (County), the Contra Costa County Flood Control District (District), the California Department of Transportation (CalTrans), the Bay Area Rapid Transit District (BART), and private parties whose involvement is not in issue here.[4] Each public entity was sued on the basis that actions it took or improvements it made or owned contributed to the increased volume and velocity of water in Reliez Creek over that which would have been carried by the creek but for the actions of those defendants, and were a substantial factor in causing the damage to plaintiffs' properties. The time within which property damage occurred for which recovery was sought was the three-year period prior to the filing of the complaint on September 13, 1983.

CalTrans and County were alleged to be developers, designers, builders, owners, and maintainers of Highway 24, Old Tunnel Road, and Pleasant Hill Road. BART was sued as the owner and developer of the rapid transit right-of-way through County. All defendants allegedly created and maintained a storm drainage system which included those portions of Reliez Creek that adjoined plaintiffs' real property.

Plaintiffs' inverse condemnation cause of action, brought under the authority of article I, section 19 of the California Constitution,[5] alleged that plaintiffs had been singled out to suffer a direct and substantial burden of the

development occurred on floodplains, as well as erosion and scouring of creek banks from increased runoff from developed areas. The study makes no mention of Reliez Creek or of the area in which plaintiffs' properties are located apart from references to "tributaries." Its primary focus is the Walnut Creek watershed, and in particular: (1) floodplain lands of Walnut, Pine, Grayson, and Galindo Creeks; (2) sedimentation in the Walnut Creek channel and in Grayson Creek; and (3) erosion on watershed slopes, gully erosion, and bank cutting which contribute to sedimentation in Walnut Creek.

[3]The "storm drainage system in and about the City of Lafayette" was alleged to be comprised of "pipelines, culverts, trenches, sewers, runouts, and waterways, including those portions of Reliez Creek adjoining Plaintiffs' real property."

[4]Negligence claims against the private parties were settled before trial.

[5]Article I, section 19: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. . . ."

storm drainage system which was a public use. Their theories were: (1) that City, County, CalTrans, District, and BART were liable because dedicated roads, rights-of-way, culverts, storm drains, other public improvements in the watershed, and the discharge of surface waters collected by private owners pursuant to a county ordinance and discharged into the creek increased the volume and flow of water into Reliez Creek, which increase was a substantial factor in causing the downstream damage; and (2) that as a result of this use and public improvements constructed in the creekbed, Reliez Creek had itself become a work of public improvement.[6] They also alleged in support of that theory that as a condition of development permits City and County had required that irrevocable dedication of storm drainage easements on creekside properties be set out in subdivision maps.[7]

---

[6] A 920-foot concrete box culvert had been constructed beneath the BART/CalTrans roadway in place of the original stream bed; a 100-foot long "sheet pile" structure had been placed in the channel in an attempt to control erosion; the "Sizeler outfall" structure, an apron of boulders bound together by concrete, was placed below the outfall of a City-owned storm drain which extended into the creek; and channel armoring had been placed at the location of the Sizeler outfall. Repairs on the Sizeler outfall were performed by a City contractor.

District acted on behalf of plaintiffs in seeking federal funds from the Soil Conservation Service (SCS) to make repairs to the creek. SCS does not accept applications directly from affected property owners. It requires a local sponsor. District acted as such, and assisted in designing the sheet pile structure, a structure consisting of steel sheet pilings lining both sides of the creek for a distance of 100 feet. SCS funded 80 percent of the cost, the affected homeowners the remaining 20 percent; and City funded a portion of the structure within the right-of-way of Condit Road, a City-owned street. District solicited construction bids, awarded the contract, made all field inspections during construction and performed the final inspection as part of its responsibility to assist County and local entities in planning drainage matters. It did not own the sheet pile structure, however. The homeowners assumed future maintenance responsibility for the structure on their portion of the creek and acknowledged in their agreement with District that the structure did not belong to County or District.

[7] A city or county must require the dedication of drainage easements as a condition precedent to the approval of either a tentative or a final subdivision map. (Gov. Code, § 66478.5.) Easements on two parcels owned by plaintiffs were dedicated to County on final subdivision maps, but were not accepted by County. City took no action to accept or reject the easements dedicated to it. (See Gov. Code, § 66477.1.) They claim on that basis that those drainage easements are not public property. A storm drainage easement on the property of plaintiff Sizeler was originally accepted by County, which maintained the storm drain on that easement until it passed to City upon incorporation in 1968. City has cleared fallen trees and other obstructions in the creek, actions which plaintiffs argued reflected implied acceptance of the easements through the exercise of control and dominion over the easements and the creek.

One final subdivision map described the easements it created as follows: "The areas marked SDE, storm drain easement and PUE are storm drain easements and are dedicated to the City of Lafayette or its designee and to the public for public use for storm, flood and surface water drainage, including construction access or maintenance of works, improvements and structures whether covered or open for the clearing of obstructions and vegetation and the exercise of the rights provided for within said storm drain easements areas shall be considered prior in time and paramount to any rights exercised by the homeowners of this subdivision . . . ."

The third cause of action, styled as one for a dangerous condition of public property,[8] alleged that unchecked surface water runoff from land and improvements, including roadways and rights-of-way, was channeled into the storm drainage system. In this cause of action plaintiffs claimed that defendants breached their duty of care by permitting the surface waters to be channeled through an inadequate storm drainage system, including Reliez Creek, without remedial action to protect adjacent properties, with the result that erosion, undercutting, destabilization, and landslides occurred on plaintiffs' property. Similar allegations underlay the nuisance and trespass causes of action.

Trial of the liability and damages issues was bifurcated. At the close of plaintiffs' case-in-chief on liability, the trial court granted defendants' motions for judgment on the inverse condemnation cause of action (Code Civ. Proc., § 631.8) and nonsuit on the tort causes of action (Code Civ. Proc., § 581c), except insofar as plaintiffs claimed City's liability arose from the maintenance of two structures, the Sizeler outfall and the sheet pile structure within Reliez Creek. Judgment for City was then granted at the close of defendants' evidence when the trial court found that plaintiffs had not proved that either structure was a substantial concurring cause of the damage to any plaintiff's property.[9]

In granting defendants' motions the trial court ruled: (1) there was insufficient evidence to establish that Reliez Creek was a storm drainage public improvement;[10] (2) the "natural watercourse rule" shielded defendants from liability for damage caused by their collection of natural surface water

---

[8]See Government Code sections 815, 830, and 810.8. Under the California Tort Claims Act, of which these sections are a part, the tort liability of a governmental entity is statutory. Under these sections liability may exist if the condition of publicly owned property "creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (Gov. Code, § 830, subd. (a).) Property damage is an "injury" within the meaning of that section. (Gov. Code, § 810.8.)

Because plaintiffs failed to comply with the claims requirements of the Governmental Tort Liability Act (see Gov. Code, § 900 et seq.), the trial court ruled that plaintiffs could not pursue this cause of action against BART.

[9]Trial was to the court on the inverse condemnation cause of action. Special and directed verdicts in favor of City were returned by the jury on the tort causes of action insofar as these structures were involved.

Plaintiffs did not dispute this ruling on appeal, but did contend that the existence of the structures was evidence relevant to whether Reliez Creek had become a public improvement.

[10]The court accepted plaintiffs' theory that if a public entity transforms a natural creek channel into a storm drainage system the creek is no longer a natural watercourse, but is an artificial public improvement.

As to County, the court found that as of 1968 only 28 percent of the watershed had been developed. There were dedicated easements from subdivisions in the area, but those easements had not been formally accepted. The evidence did not establish that County had exerted

drainage and discharge of that water into a natural channel even if the volume and velocity of the water caused the damage; (3) there was insufficient evidence that BART improvements substantially contributed to plaintiffs' damages; (4) there was insufficient evidence that water CalTrans diverted from another watershed to the Reliez Creek watershed substantially contributed to the damage;[11] (5) County had no liability because in 1968 it had relinquished ownership and control over any public improvements that might have contributed to the damage; and (6) there was no evidence that District owned or controlled any public improvement within the watershed that might have contributed to the damage.

## II

### PLAINTIFFS' APPEAL

Plaintiffs' appeal was directed principally to the disposition of their inverse condemnation claim. They argued, however, that the trial court erred in applying the *Archer* natural watercourse rule to give defendants absolute immunity from liability on both the inverse condemnation and the tort claims. With respect to the inverse condemnation claims, plaintiffs also argued that they were entitled to relief under *Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550 [253 Cal.Rptr. 693, 764 P.2d 1070], because defendants' conduct was not reasonable;[12] and that the trial court erred in holding that, because plaintiffs had not established the damage caused by each defendant individually, they failed to demonstrate that defendants were jointly and severally liable for the combined damage to their property. They argued that the evidence established, as a matter of law,

---

dominion and control of the creek by maintenance, inspection, approval or issuance of permits, or other activity such as to transform it into a work of public improvement.

The court conceded that the question was closer with respect to City, but found that the evidence did not establish that City had impliedly accepted easements or exercised dominion and control to the extent that the creek had become a part of a storm drainage system.

[11]The combined CalTrans and BART contribution to the increased flow into Reliez Creek was 9.2 percent. BART's acreage constituted only .01 percent of the watershed, and its improvements contributed only .02 percent to the increased flow of surface waters into Reliez Creek.

The expert testimony did not differentiate BART responsibility for plaintiffs' damage from that attributed to CalTrans. The trial court ruled that evidence of the amount of damage each caused was necessary at the liability phase in order to establish that a public entity's actions satisfied the "substantial concurring cause" element of an inverse condemnation cause of action, and for that reason also found the evidence insufficient as to BART and CalTrans.

[12]While recognizing that the Court of Appeal was bound by *Belair*, plaintiffs also argued that if they were not entitled to recover on grounds that defendants' conduct was unreasonable within the meaning of that decision, *Belair* was incorrectly decided to the extent that it relied on *Archer*. *Archer*, they argued, had been overruled by subsequent cases and conflicted with the language and policy of article I, section 19 of the California Constitution.

that Reliez Creek had been used in such a way that it had become a work of public improvement; that, as a matter of law, City, County, BART, and CalTrans had acted unreasonably; and that City, County, BART, and Cal-Trans were jointly liable for the damages caused by the water runoff from their roads and paved areas.

The Court of Appeal affirmed the judgment of the trial court in all respects, holding that it was bound by *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 456 [20 Cal.Rptr. 321, 369 P.2d 937] to apply the *Archer* natural watercourse rule, which on the facts of this case, immunized defendants from liability for any damage caused by their use of Reliez Creek as a natural drainage channel.

### III

#### THE *ARCHER* DECISION

The Court of Appeal based its ruling on this court's statement in *Archer* that "there is no diversion [for which liability would exist] if surface waters, flowing in no defined channel, are for a reasonable purpose gathered together and discharged into the stream that is their natural means of drainage even though the stream channel is inadequate to accommodate the increased flow." (*Archer, supra,* 19 Cal.2d 19, 26.)

The Court of Appeal also concluded that decisions subsequent to *Archer* had reaffirmed, not repudiated, the holding in *Archer* that governmental entities are immune from liability under article I, section 19 of the California Constitution insofar as that holding was applicable to damages for which a private owner would be shielded from liability by the natural watercourse rule. That "*Archer* exception" to inverse condemnation liability held that "[i]f the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state." (*Archer, supra,* 19 Cal.2d 19, 24.)

To put in perspective our examination of public and private landowner responsibility for damage to downstream property caused by discharge of "surface waters" into a "natural watercourse," it is therefore appropriate to define these terms and to describe in more detail the *Archer* decision.

A. *Surface Waters.*

██ . In the arcane area of water law under consideration in this case, the rights and liabilities of private property owners for property damage or

personal injury are in large part dependent upon classification of the water as "surface waters," "flood waters," or "stream waters." "Water diffused over the surface of land, or contained in depressions therein, and resulting from rain, snow, or which rises to the surface in springs, is known as 'surface water.' It is thus distinguishable from water flowing in a fixed channel, so as to constitute a watercourse, or water collected in an identifiable body, such as a river or lake. The extraordinary overflow of rivers and streams is known as 'flood water.' (Tiffany on Real Property (3d ed.) § 740; 8 Cal.L.Rev. 197.)" (*Keys* v. *Romley* (1966) 64 Cal.2d 396, 400 [50 Cal.Rptr. 273, 412 P.2d 529].)

B. *Natural Watercourse.*

■ A natural watercourse "is a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of the year and at those times when the streams in the region are accustomed to flow. It is wholly different from a swale, hollow, or depression through which may pass surface waters in time of storm not collected into a defined stream." (*San Gabriel V.C. Club* v. *Los Angeles* (1920) 182 Cal. 392, 397 [188 P. 554, 9 A.L.R. 1200].) A canyon or ravine through which surface water runoff customarily flows in rainy seasons is a natural watercourse. Alterations to a natural watercourse, such as the construction of conduits or other improvements in the bed of the stream, do not affect its status as a "natural" watercourse. (*LeBrun* v. *Richards* (1930) 210 Cal. 308, 317, 318 [291 P. 825, 72 A.L.R. 336]; *Larrabee* v. *Cloverdale* (1900) 131 Cal. 96, 99-100 [63 P. 143].) A natural watercourse includes "all channels through which, in the existing condition of the country, the water naturally flows," and may include new channels created in the course of urban development through which waters presently flow. (*Larrabee* v. *Cloverdale, supra,* 131 Cal. at p. 100.) Once surface waters have become part of a stream in a watercourse, they are no longer recognized as surface waters. (*San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. at p. 398.)

C. *Archer.*

*Archer, supra,* 19 Cal.2d 19, was an action brought by nonriparian landowners for damage caused to their property when surface water runoff channeled into a natural watercourse, from which it was discharged into a lagoon, exceeded the capacity of an outlet pipe from the lagoon to the sea, backed up, and caused flooding. Although the injury was to nonriparian landowners, the court applied the rules then governing the liability of upper riparian landowners to lower riparian owners and the decision has since been relied on as establishing immunity for any damage to downstream riparian

property caused by discharge of surface water runoff into a natural watercourse.

The plaintiffs in *Archer* were owners of property near La Ballona Lagoon. La Ballona Creek, a natural watercourse, drained surface waters from an area of about 134 square miles into the lagoon, from which the waters emptied into the Pacific Ocean. As residential and commercial development occurred in the hills at the upper reaches of the creek, surface waters that had not followed a defined course were diverted into ditches and channels which emptied into the creek. Defendants, the City of Los Angeles and the Los Angeles County Flood Control District, straightened, widened and deepened the creek. They constructed concrete storm drains to improve drainage. As a result of these changes less water was absorbed into the ground and the flow of waters from the creek into the lagoon was accelerated. Defendants did not improve the outlet from the lagoon to the ocean, however, and after a heavy rain the water in the lagoon backed up, flooding plaintiffs' property. They sued on a theory of inverse condemnation under former section 14 (now section 19) of article I of the California Constitution. Nonsuit was granted and plaintiffs appealed.

Under what was then this court's view of article I, section 14, the predecessor to present section 19, the Constitution did not create a cause of action. It did no more than waive the state's sovereign immunity if a cause of action would otherwise exist. Therefore, plaintiffs could recover only if a private landowner would be responsible for the damage suffered by plaintiffs. If a private party had the right to inflict the damage without incurring liability, the governmental defendants would not be liable. The court therefore analyzed the claim as it would one involving the rights of private landowners to drain surface waters from their property into a natural watercourse.

The court stated the applicable rules as:

1. A lower owner may not recover for injury to his land caused by improvements made in the stream for the purpose of draining or protecting the land above, even though the channel is inadequate to accommodate the increased flow of water resulting from the improvements. It is immaterial that the improvements increase the volume and velocity of the water, that the lower owner's burden of protecting his property is increased, or that his land is damaged.

2. Improvements must follow the natural drainage and may not divert water into a different channel, but straightening, widening, and deepening the channel does not constitute a diversion.

3. There is no diversion if, for a reasonable purpose, diffused surface waters are gathered and discharged into a stream that is their natural means of drainage even if the watercourse is inadequate to accommodate the increased flow. An upper riparian landowner may gather surface waters for a reasonable purpose and discharge them into a natural watercourse without liability to a lower owner for damage caused by the increased flow.

Possibly because there was no claim that the defendants had acted unreasonably in their upstream improvements, however, the *Archer* holding omitted reference to an important qualification on the rights of the upper riparian owner implied in *San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, the case on which *Archer* relied for the rule: i.e., that the purpose for the improvements not only be reasonable, but the improvements must also be constructed in a manner that was no more burdensome to the lower riparian owner than required for that purpose. (182 Cal. at pp. 396, 399-401.)

This qualification was implied repeatedly in *San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, viz.: "No complaint is made of the manner in which the drains are constructed, or that they are not reasonable improvements for the district they are designed to protect, or that they are unnecessarily injurious to the plaintiff . . . ." (*Id.,* at pp. 399-400.) "[In the related situation of release of water from a mill] no right of action by a land owner below exists because of the increase of volume and consequent acceleration of flow, provided the use is a reasonable one and exercised in a reasonable manner." (*Id.,* at p. 401.)

Certainly the *San Gabriel V.C. Club* decision did not hold that any surface water drainage into a natural watercourse was immunized in this state. It implied the contrary, and made it clear that this question was not before the court. "[D]ecisions in other states go further than it is necessary to go in this case, and hold that a riparian owner has no right to complain because the volume of water in the stream is increased by artificially draining surface waters into it above, provided only the stream is the natural drainage channel for the lands so drained." (182 Cal. at pp. 401-402.)

Since there was no issue involving unreasonable conduct in draining surface waters into the stream bed in *Archer, supra,* 19 Cal.2d 19, that decision also fails to support a conclusion that immunity exists regardless of whether the upstream owner acted reasonably.

Moreover, the principal focus of both *Archer, supra,* 19 Cal.2d 19, and *San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, was on alterations of and improvements in the stream bed itself, and on waters that had

lost their character as surface waters and had become stream waters before they reached the stream bed improvements (drains) constructed by the defendants. Neither case addressed liability for downstream damage caused by the discharge of surface waters into a natural watercourse. Therefore, we do not assume, as do defendants, that the rule governing surface waters has no application here or that *Archer* established a rule granting immunity to an upstream riparian owner for damages caused as a result of discharges of surface water into a natural watercourse regardless of whether his conduct was reasonable with regard to downstream owners.

IV

RIGHTS AND LIABILITIES OF PRIVATE PROPERTY OWNERS

Defendants are both property owners and governmental entities. Their potential liability as governmental entities for damage caused by discharge of surface waters into a natural watercourse is no longer limited, as it was at the time of *Archer, supra,* 19 Cal.2d 19, to the liability a private party would incur. Additionally, since *Archer* we have made it clear that private parties do not enjoy the broad immunity recognized at the time of *Archer* for discharge of surface waters across lower properties. ▆▆▆ Therefore, we shall first consider the holding of the Court of Appeal that a private property owner has no liability for damage to downstream riparian owners caused by his discharge of surface waters into a natural watercourse.

A. *The California Civil Law Rule.*

At common law the "common enemy doctrine" gave an owner of land over which surface water flowed from a higher elevation the right to obstruct the flow of that water, turning it back or diverting it onto the land of another owner, without liability for any damage that might result. (*Keys* v. *Romley, supra,* 64 Cal.2d 396, 400-401.)

By contrast, the civil law rule adopted for California more than a century ago (see *Ogburn* v. *Connor* (1873) 46 Cal. 346) gave the owner of the higher land an easement or servitude over a lower parcel which allowed him to discharge surface waters as they naturally flow from his higher land onto the lower land of the servient owner. (*Los Angeles C. Assn.* v. *Los Angeles* (1894) 103 Cal. 461, 466 [37 P. 375]; *Gray* v. *McWilliams* (1853) 98 Cal. 157, 165 [32 P. 976]; *Ogburn* v. *Connor, supra,* 46 Cal. 347, 352-353.) The lower owner had no right to obstruct that flow. In theory, the owner of the lower parcel accepted it with the burden of natural drainage. (*Keys* v. *Romley, supra,* 64 Cal.2d 396, 402.) Nonetheless, the owner of the higher

land was not permitted to gather the surface waters "by artificial means and discharge them on to lower lying land in greater volume or in a different manner than they would naturally be discharged." (*San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, 398.)[13]

B. *The Natural Watercourse Rule.*

The rule differed with respect to discharge of surface waters into a natural watercourse. As we noted in *Archer* (*supra,* 19 Cal.2d at p. 26), an upper riparian owner had the right, for a reasonable purpose, to discharge surface waters, including those whose volume was increased as a result of development which altered both the absorption of waters by the soil and the drainage pattern, into a natural watercourse. It was immaterial that the watercourse was inadequate to accommodate the increased flow and flooded downstream property. The riparian owner also had the right to improve the channel even if the accelerated flow caused downstream damage. (*Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 283 [289 P.2d 1].)[14]

Thus, a riparian owner might be the ultimate "beneficiary" of the civil law rule subjecting lower parcels of property to the burden of surface water runoff from parcels at a higher elevation. The owner had the right, in turn, however, to discharge the surface waters into a natural watercourse without liability for damage that the addition of these waters to the stream might do to downstream riparian property. The downstream riparian owner is also deemed to take the property subject to an easement or servitude, one burdening the downstream property with accepting the flow of whatever water is thereby carried onto or through it in a natural watercourse.

---

[13]As described in one treatise, "The natural flow rule, or as it is sometimes called, the 'civil law' rule, originated in Louisiana and Pennsylvania. It 'places a natural easement or servitude upon the lower land for the drainage of surface water in its natural course and the natural flow of the water cannot be obstructed by the servient owner.'

"The way the civil law rule works is that an upper landowner has a right as landowner to the natural drainage of diffused surface waters onto the lower property in the form of a 'natural' servitude. This means the lower owner has a duty to respect that right and if the lower owner interferes, the upper owner has a claim against the lower owner. But, in turn, the upper owner may be a lower owner in relation to someone else. Furthermore, if the scope of the servitude is exceeded, that is, surcharged, the lower neighbor will have a claim against the upper owner. The fact that flow creates a 'natural' easement refers only to the way in which the 'easement' arose. The treatment of natural flow as a servitude invokes the entire body of easement law and gives the natural flow right stature as an interest in real property; therefore, a legislative body may be more restricted by the constitution in dealing with it." (5 Waters and Water Rights (Beck ed. 1991) § 59.02(b)(2), p. 505, fns. omitted.)

[14]We need not decide if this statement of the rule was consistent with the generally applicable civil law rule governing natural watercourses, and with prior California law. That rule, too, may have been limited to discharges which did not increase the volume or accelerate the flow of water in a watercourse beyond that produced by natural runoff of surface waters. (See *LeBrun* v. *Richards, supra,* 210 Cal. 308, 318; *Thomson* v. *La Fetra* (1919) 180 Cal. 771 [183 P. 152].)

Moreover, a riparian landowner has had the right to "collect" or "gather" surface waters and discharge them at a location or locations other than those where natural runoff would enter the watercourse. The owner could straighten the stream or improve its bed with paving, drains, or conduits, and, to protect the land, construct dikes or bulkheads even if the result was to increase the volume and velocity of the waters to the injury of lower owners.

"[A] riparian owner has no right to complain because the volume of water in the stream is increased by artificially draining surface waters into it above, provided only the stream is the natural drainage channel for the lands so drained. Furthermore, this rule is adopted regardless of whether the so-called common-law rule concerning surface waters prevails in the particular jurisdiction or, as here, the civil-law rule, which forbids the gathering together of surface waters and discharging them as a stream upon adjoining lands. If the surface waters are gathered and discharged into the stream which is their natural means of drainage, so that they come to the land below only as a part of the stream, it is held that no action lies because of their being added." (*San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, 401-402.) "If a riparian owner cannot complain if surface waters be actually added by artificial drainage above to the volume of the stream, it must certainly be that he cannot complain of a drainage improvement which adds no water to the stream but merely protects the adjoining lands against the water already in it." (*Id.,* at p. 402.)

The immunity of the upper riparian owner for downstream damage caused by his discharge of surface water runoff into a natural watercourse through improvements was initially for improvements undertaken to drain and/or protect the upper riparian owner's land. "[A]n improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden; and, further . . . the rule is not subject to the limitation that the increased volume must not be such as to make the stream exceed the capacity of its channel." (*San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, 406.)

We again recognized that this immunity was for damage to downstream land caused by improvements made in the stream for the purpose of draining or protecting the land above in *Archer.* (*Supra,* 19 Cal.2d 19, 24-25.) And, in *Archer,* since the drainage improvements in the creekbed were permissible, we declined to impose a requirement that the plan minimize downstream

damage by provision for improving the outlet from the lagoon into which the watercourse drained. (*Id.*, at pp. 25-26.)

The California rules applicable to runoff of surface waters onto adjacent property and into natural watercourses have accommodated progression from a rural, agricultural society to gradual urbanization. Although immunity of upper landowners was limited to "natural" runoff of surface waters, it was broad enough to encompass surface water runoff from fields cultivated in a natural way, even though cultivation altered the runoff from that which occurred from untilled fields. (*Coombs* v. *Reynolds* (1919) 43 Cal.App. 656, 660 [185 P. 877]. See also *Switzer* v. *Yunt* (1935) 5 Cal.App.2d 71, 78 [41 P.2d 974].) But immunity did not extend to city lots where "changes and alterations in the surface were essential to the enjoyment of such lots . . . ." (*Los Angeles C. Assn.* v. *Los Angeles, supra,* 103 Cal. 461, 467.)

■ As suggested above, the natural watercourse rule has two aspects. The first permits the riparian landowner to gather surface waters and discharge them into the watercourse at a location other than that at which natural drainage would occur. The second permits the owner to make improvements in the bed of the stream to improve drainage and to protect the land from erosion by constructing dikes or embankments even though the result may be increased flow and velocity which might damage the property of lower riparian owners. Both aspects of the rule have as their purpose facilitating the development of upstream properties. "Not to permit an upper land owner to protect his land against the stream would be in many instances to destroy the possibility of making the land available for improvement or settlement and condemn it to sterility and vacancy." (*San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, 401; see also, *Archer, supra,* 19 Cal.2d at p. 27.)

C. *The Contemporary Rule of Reasonableness.*

■ ■ The modern rule governing landowner liability for surface water runoff and drainage is no longer simply a rule of property law dependent upon the existence of rights, servitudes, or easements. The civil law rule was modified more than a quarter of a century ago by the landmark decision in *Keys* v. *Romley, supra,* 64 Cal.2d 396. There we recognized the tendency of the civil law rule limiting immunity for damages caused by surface water runoff onto an adjacent property to inhibit development of land, since any change in the upper property would affect the natural runoff. (*Id.*, at p. 402.) Today a landowner's conduct in using or altering the property in a manner which affects the discharge of surface waters onto adjacent property is subject to a test of reasonableness.

"It is . . . incumbent upon every person to take reasonable care in using his property to avoid injury to adjacent property through the flow of surface waters. Failure to exercise reasonable care may result in liability by an upper to a lower landowner. It is equally the duty of any person threatened with injury to his property by the flow of surface waters to take reasonable precautions to avoid or reduce any actual or potential injury.

"If the actions of both the upper and lower landowners are reasonable, necessary, and generally in accord with the foregoing, then the injury must necessarily be borne by the upper landowner who changes a natural system of drainage, in accordance with our traditional civil law rule." (*Keys* v. *Romley, supra,* 64 Cal.2d 396, 409.)

At least with respect to surface water runoff onto adjacent lands, the California rule is that stated in *Keys* v. *Romley, supra,* 64 Cal.2d 396, 409: "No party, whether an upper or a lower landowner, may act arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability."

It has been suggested that with the adoption of the reasonable use test for surface waters "there is no longer any valid reason for distinguishing between surface waters and those that flow through a natural watercourse with respect to the rights and obligations of the respective property owners." (5 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 14:24, p. 357; see also *Hall* v. *Wood* (Miss. 1983) 443 So.2d 834, 838 ["As recently as 1978 this Court intimated that there might be a difference in principle between the two types of cases. [Citation.] Upon reflection, that difference escapes us."].)

▆▆▆ Defendants argue that the natural watercourse rule does not include a reasonableness element and should remain the law. They contend that the rationale on which the rule is based remains valid, and that application of the *Keys* v. *Romley* rule of reasonableness would create a virtual strict liability for public entities owning streets, storm drains, or other water-impervious improvements. Public entities, they claim, would bear extraordinary liability solely because storm waters falling on their thoroughfares ultimately reach a natural watercourse. The natural watercourse rule, they argue, properly permits the natural and intended usage of the creeks and waterways as a means of discharging the waters which would normally be conveyed therein.

The argument both misstates the issue and exaggerates the potential liability. Draining surface waters from impermeable surfaces and channeling the flow into a waterway in culverts and storm drains is not the manner in which surface water would naturally be discharged into a waterway. Both

the volume and the velocity of the discharge are abnormal, and it is the damage which may be caused by that unnatural method of drainage that is in issue. Our past decisions do not hold that immunity exists under the natural watercourse rule or its analogs for conduct which alters natural drainage and thereby creates a danger to downstream property owners if that danger is unreasonable in light of the purpose of the upstream action, the manner in which it is carried out, and the alternatives that might avoid or mitigate the potential damage.

Nor is the reasonable use rule one of strict liability. It requires consideration of all of the relevant circumstances, and anticipates that both the upstream riparian owner and the downstream owners will act reasonably. It does not, however, give defendants what they ask—an unqualified right to discharge surface water runoff in a manner that will cause downstream damage, and even destroy downstream property, without attempting reasonable measures to prevent or minimize downstream damage.[15]

Defendants offer no justification for a rule that would distinguish between the discharge of surface waters directly onto another owner's property and the discharge into a natural waterway that ultimately has the same injurious effect. They seek instead absolute immunity for the discharge of surface water runoff into a natural watercourse whether or not they have reduced or eliminated the capacity of the ground to absorb normal rainfall, channeled the runoff into a single destructive outlet, or otherwise altered the volume and velocity of the waters discharged into the watercourse, and regardless of whether the watercourse is capable of carrying the increased flow of waters. In short, they seek to avoid the conclusion of *Keys* v. *Romley* (*supra*, 64 Cal.2d 396) that both upper and lower landowners must act reasonably with respect to one another. The upper riparian owner, they argue, has a right to engage in unreasonable conduct without regard to the impact of the action on downstream property.

Defendants, who assume that *Keys* v. *Romley*, *supra*, 64 Cal.2d 396, does not apply to discharge of surface water into a natural watercourse or to improvements in a watercourse, offer no justification, other than the fact that they might incur liability, for recognizing a distinction between the duty of a riparian property owner to avoid injury to downstream property owners, and the duty of an uphill owner to downhill owners. We do not share the

---

[15]Several cities and counties, appearing as amici curiae in support of defendants, also urge retention of the natural watercourse rule. Among their concerns is fear that liability may be imposed for downstream damage that is alleged to be a product of discretionary approval of development. While the issue of liability solely for approving development of private property is not before us in this case, we note that public entities enjoy broad statutory immunity for such acts. (See, e.g., Gov. Code, §§ 818.2, 818.4, 821.)

assumption that either a private or public property owner may disregard the impact of its conduct on other properties whether those properties are downstream or downslope.

This court has restated the natural watercourse rule in several cases since *Keys* v. *Romley*, each of which involved an action against a municipal corporation or other governmental entity. In those cases, however, we have not considered whether that rule, as applied in this state, does include an element of reasonableness, or whether the rule of *Keys* v. *Romley*, *supra*, 64 Cal.2d 396, which expressly holds that the upper owner's conduct be reasonable, applies to the manner in which a riparian owner discharges surface waters into a natural watercourse.[16]

Although this court has not considered the latter question, the Court of Appeal has done so in a series of decisions in which the court either assumed that the rule of reasonableness is applicable or expressly held it to be applicable to discharges into natural watercourses or flood control improvements in a watercourse. In *Ektelon* v. *City of San Diego* (1988) 200 Cal.App.3d 804 [246 Cal.Rptr. 483], nonsuit for a private developer was reversed. The Court of Appeal held that *Keys* v. *Romley*, *supra*, 64 Cal.2d 396, created a "broad rule of reasonableness to be applied to all factual situations, . . ." (200 Cal.App.3d at p. 808.) Therefore, ordinary negligence principles governed the manner in which flood control structures were constructed because "[a]n upstream landowner has no absolute right to protect his land from floodwaters by constructing structures which increase the downstream flow of water into its natural watercourse, but is instead governed by the ordinary principles of negligence." (*Id.*, at p. 810.)

In *Martinson* v. *Hughey* (1988) 199 Cal.App.3d 318 [244 Cal.Rptr. 795], the court assumed that the rule of reasonableness applied to the discharge of

[16]Contrary to the argument of defendants, we did not cite *Archer* with approval in *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296 [90 Cal.Rptr. 345, 475 P.2d 441]. Holtz did not involve surface waters or natural watercourses. *Archer*, *supra*, 19 Cal.2d 19, was among the cases cited in a discussion of the common law concept of the "right to inflict damage." Rather than indicate approval of those cases, all of which predated *Keys* v. *Romley*, *supra*, 64 Cal.2d 396, we stated that we need not examine their continued validity. (*Holtz* v. *Superior Court*, *supra*, 3 Cal.3d 296, 307.)

And, far from reaffirming the *Archer* rule in *Belair* v. *Riverside County Flood Control Dist.*, *supra*, 47 Cal.3d 550, we expressly recognized that the *Keys* v. *Romley* rule of reasonableness had been applied by the Court of Appeal to actions involving private landowners' treatment of flood and stream waters. (47 Cal.3d at pp. 567-568, fn. 8.) And we applied *Keys* v. *Romley* in that case. (47 Cal.3d at p. 566.) The only aspect of *Archer* applied in *Belair* was the rule granting immunity for damage caused by measures undertaken to prevent damage by floodwaters. In the context of inverse condemnation, rather than impose strict liability for damage caused by flooding when a public flood control levee failed to contain waters within its design capacity, we held that because the activity was one that was privileged under the *Archer* doctrine, a public agency would be liable only if its conduct posed an unreasonable risk of harm.

irrigation waters and surface waters into a natural watercourse. There a lower owner had blocked a natural watercourse with debris which backed water up onto the upper land. Applying the rule to irrigation waters, the court concluded: "The rule we deduce . . . is that the upper owner has the right to discharge reasonable and noninjurious amounts of irrigation water through natural areas of flow onto the lower owner's property. The lower owner has a co-equal burden to receive reasonable and noninjurious amounts of irrigation water through natural flowage channels." (199 Cal.App.3d 318, 328.)

In *Weaver* v. *Bishop* (1988) 206 Cal.App.3d 1351 [254 Cal.Rptr. 425], the question was liability for damages for improvements in a natural watercourse constructed for the purpose of protecting the defendants' property. The court held that the reasonable use doctrine articulated in *Keys* v. *Romley, supra,* 64 Cal.2d 396, 408-409, was properly applied in an action predicated on damage caused by the riparian owner's installation of riprap (boulders) along the stream bank to protect the land from erosion. The riprap altered the flow of the stream sufficiently that erosion occurred on the opposite bank, the owners of which sued. Given an instruction that liability depended on the reasonableness of each party's conduct, the jury found by special verdict that defendants' conduct was reasonable, while that of plaintiffs was not.

The Court of Appeal reasoned in *Weaver* v. *Bishop* that neither the rule which gave a riparian owner absolute immunity for alteration in stream flow to protect his property, nor the "common enemy doctrine" which permits an owner to protect himself against floodwaters, even by turning them onto another's land, should apply. "The common enemy doctrine is one form of the 'right to inflict damage,' which was traditionally referred to under the [rubric] 'damnum absque injuria' (harm without legal injury). This notion, peculiar to water law, rested on the 'generally perceived reasonableness' of actions taken to protect one's property and on a policy of encouraging the preservation of land resources. [Citation.] However the nearly unanimous trend has been away from per se rules based on categorical judgments of 'generally perceived reasonableness,' and toward fact-based determinations of reasonableness in the particular circumstances of each case." (*Weaver* v. *Bishop, supra,* 206 Cal.App.3d 1351, 1357, fn. omitted.)

"[A]s *Keys* acknowledges and illustrates, the general trend in water-damage cases is to replace the rigidities of property law with the more flexible, conduct-oriented principles of tort. (See 64 Cal.2d at p. 408.) ▆▆ ▆ Under the latter as expressed in the Second Restatement of Torts, defendants' liability would depend on a balancing of reasonableness,

either by analogy to the rules concerning interference with water use, or under the rules of nuisance and trespass." (206 Cal.App.3d at p. 1358.)[17]

The Court of Appeal in this case reasoned that important policy reasons had initially supported the immunity doctrine and saw no compelling reason to reject it, noting that it was bound in any case to follow the precedent established in *Archer*. The court observed that the *Archer* rule had been followed in *Deckert* v. *County of Riverside* (1981) 115 Cal.App.3d 885, 895, 896 [171 Cal.Rptr. 865], and elected to join the *Deckert* court, rather than the courts which had concluded that the rule of absolute immunity had been replaced by a rule of reasonableness.

The *Deckert* opinion followed what that court believed to be the rule established in *Archer* and our subsequent decision in *Bauer* v. *County of Ventura, supra,* 45 Cal.2d 276, without mention of *Keys* v. *Romley, supra,* 64 Cal.2d 396, however. It does not support a conclusion that the *Archer* rule does not include a requirement of reasonableness or that, if the *Archer* rule does not, it survived *Keys* v. *Romley*.

By contrast, *Weaver* v. *Bishop, supra,* 206 Cal.App. 3d 1351, *Ektelon* v. *City of San Diego, supra,* 200 Cal.App.3d 804, and *Martinson* v. *Hughey, supra,* 199 Cal.App.3d 318, and, of course, *Keys* v. *Romley, supra,* 64 Cal.2d 396, reflect the nationwide trend toward merger of the rules governing diffused surface water and those governing watercourses. (See Tarlock, Law of Water Rights and Resources (1993) § 305[1], pp. 3-14 to 3-15.)

We need not decide whether the natural watercourse rule applicable at the time of *Archer, supra,* 19 Cal.2d 19, included an element of reasonableness

[17]As we pointed out in *Keys* v. *Romley, supra,* 64 Cal.2d 396, 409, the rule "is not one of strict negligence accountability . . . [t]he question is reasonableness of conduct."

One need not abandon concepts of property law to reach the result of *Keys* v. *Romley, supra,* 64 Cal.2d 396, that the upper landowner's conduct must be reasonable. As noted above (see fn. 13), traditional rules of property law forbid overburdening an easement or servitude and unreasonable conduct in exercising rights under either. "[T]he owner of a dominant tenement must use his easement and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Baker* v. *Pierce* (1950) 100 Cal.App.2d 224, 226 [223 P.2d 286].) "Every easement includes . . . the right to do such things as are necessary for the full enjoyment of the easement itself. But this right is limited, and must be exercised in such reasonable manner as not to injuriously increase the burden on the servient tenement. The burden of the dominant tenement cannot be enlarged to the manifest injury of the servient estate by any alteration in the mode of enjoying the former. The owner cannot commit a trespass upon the servient tenement beyond the limits fixed by the grant or use." (*North Fork Water Co.* v. *Edwards* (1898) 121 Cal. 662, 665-666 [54 P. 69].)

The extent of the upper landowner's easement for drainage and protection is that which the parties might reasonably expect from the future normal development of the dominant tenement. (*Camp Meeker Water System, Inc.* v. *Public Utilities Com.* (1990) 51 Cal.3d 845, 866-867 [274 Cal.Rptr. 678, 799 P.2d 758].)

These considerations are relevant to whether a landowner's conduct is reasonable.

because we agree with those courts which have held that *Keys* v. *Romley* states a rule that is applicable to all conduct by landowners in their disposition of surface water runoff whether the waters are discharged onto the land of an adjoining owner or into a natural watercourse, as well as to the conduct of upper and lower riparian owners who construct improvements in the creek itself.

Although *Keys* v. *Romley* was decided in the context of damage caused to adjacent land by the discharge of surface waters, the reasoning of the court has broader applicability. The decision rests on the broad principle that a landowner may not act "arbitrarily and unreasonably in his relations with other landowners and still be immunized from all liability. [¶] It is therefore incumbent upon every person to take reasonable care in using his property to avoid injury to [other] property . . . ." (*Keys* v. *Romley, supra,* 64 Cal.2d at p. 409.) While the court spoke in terms of the responsibilities of adjacent landowners with respect to surface waters, we did not intend thereby to imply that the obligation to take reasonable care was not one imposed also on upper and lower riparian owners. There is no exception from the rule of reasonableness for riparians. No logic would support such a distinction and we decline to recognize one.

Defendants' argument that *Keys* v. *Romley* is not and should not be applicable to discharge of surface waters into a natural watercourse overlooks the authority on which *Keys* v. *Romley* relied for the rule of reasonableness that it enunciated. That rule is derived from *Armstrong* v. *Francis Corp.* (1956) 20 N.J. 320 [120 A.2d 4, 59 A.L.R.2d 413]. (*Keys* v. *Romley, supra,* 64 Cal.2d at p. 410.) *Armstrong* is a natural watercourse case.

The facts which gave rise to the New Jersey Supreme Court's decision to abandon the common enemy/immunity rule in *Armstrong* v. *Francis Corp., supra,* 20 N.J. 320 [120 A.2d 4], are not unlike the facts in the case before this court. A housing developer stripped his tract, covered a stream that was a natural watercourse, and built a drainage system which conveyed not only the surface water runoff, but also percolating waters under the surface, into a pipe which discharged these waters into the stream above plaintiffs' property. As a result, the increased volume of water and its accelerated speed tore into the banks of the stream and, at the time of the lawsuit had carried away 10 feet of the plaintiff's creekside property with no end to the erosion in sight. Adopting the rule of reasonableness for that state, the New Jersey Supreme Court concluded: "Social progress and the common wellbeing are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason." (120 A.2d at p. 10.)

New Jersey is not alone in abandoning the common enemy/immunity doctrine. A majority of jurisdictions now apply a rule of reasonableness to the discharge of surface waters into a natural watercourse when the discharge will overtax the capacity of the watercourse or drainage channel and cause damage to downstream property. (5 Waters and Water Rights, *supra*, § 59.02(b)(1), p. 503; see, e.g., *Heins Implement Co. v. Hwy. & Transp. Com'n* (Mo. 1993) 859 S.W.2d 681; *Hansen v. Gary Naugle Const. Co.* (Mo. 1990) 801 S.W.2d 71; *Johnson v. NM Farms Bartlett, Inc.* (1987) 226 Neb. 680 [414 N.W.2d 256]; *Martin v. Weckerly* (N.D. 1985) 364 N.W.2d 93; *Peterson v. Town of Oxford* (1983) 189 Conn. 740 [459 A.2d 100]; *County of Clark v. Powers* (1980) 96 Nev. 497 [611 P.2d 1072].)

The suggestion that the court would find the reasoning of *Armstrong v. Francis Corp.*, *supra*, 120 A.2d 4, persuasive, but only insofar as surface water runoff onto adjacent property is concerned and not in the context in which that case was decided, is further undermined by recognition that other cases on which the court relied in *Keys v. Romley*, *supra*, 64 Cal.2d 396, also stated rules of reasonableness applicable to both runoff onto adjacent property and into a natural watercourse. In *Bassett v. Salisbury Manufacturing Company* (1862) 43 N.H. 569, 576, the court discussed both types of drainage and stated: "[S]o far as a similarity of benefits and injuries exists, there should be a similarity in the rules of law applied." "The rights of each land-owner being similar, and his enjoyment dependant [*sic*] upon the action of the other land-owners, these rights must be valueless unless exercised with reference to each other, and are correlative. The maxim, '*Sic utere,*' &c., [*Sic utere tuo ut alienum non laedas*—use your own property in such a manner as not to injure that of another] therefore applies, and, as in many other cases, restricts each to a reasonable exercise of his own right, a reasonable use of his own property, in view of the similar rights of others. Instances of its similar application in cases of water-courses . . . are too numerous and familiar to need more special mention. As in these cases of the water-course, so in the drainage, a man may exercise his own right on his own land as he pleases, provided he does not interfere with the rights of others." (*Id.*, at p. 577.)

In *Swett v. Cutts* (1870) 50 N.H. 439, 446, also relied on by the court in *Keys v. Romley* (*supra*, 64 Cal.2d at p. 404), the same theme of reasonable conduct regardless of the nature of the water right being exercised was again expressed: "The doctrine which we maintain adapts itself to the ever varying circumstances of each particular case,—from that which makes a near approach to a natural water-course, down by imperceptible gradations to the case of mere percolation, giving to each land owner, while in the reasonable use and improvement of his land, the right to make reasonable modifications

of the flow of such water in and upon his land. [¶] In determining this question all the circumstances of the case would of course be considered; and among them the nature and importance of the improvements sought to be made, the extent of the interference with the water, and the amount of injury done to the other land owners as compared with the value of such improvements, and also whether such injury could or could not have been reasonably foreseen." (50 N.H. at p. 446.)

Most recently, the Missouri Supreme Court has brought all types of water within the rule of reasonableness. In *Heins Implement Co.* v. *Hwy. & Transp. Com'n, supra,* 859 S.W.2d 681, 691, the court observed: "The standard we sanction today is in harmony with the most basic tenets of our law. 'Reasonableness is the vital principle of the common law.' [Citation.] Reasonable use concepts already govern the rights of users of our watercourses, subterranean streams, and subterranean percolating waters. [Citations.] To some extent, they have also applied to upper land owners through the modified common enemy doctrine. Their extension to the management of all diffuse surface waters finally 'bring[s] into one classification all waters over the use of which controversy may arise.' "

Defendants have offered no persuasive reason to limit the requirement that landowners act reasonably with regard to one another to their treatment of surface water discharge onto adjacent property while permitting unreasonable conduct when the waters are discharged into a natural watercourse. Indeed, defendants appear to overlook the impact on their own interests of a rule which would afford them no recourse if a private developer discharged surface water runoff into a natural watercourse adjoining publicly owned property in a manner which undercut and washed away a portion of that property. We agree with plaintiffs, therefore, that the rule of *Keys* v. *Romley* applies to this dispute.

█ Under that rule: "The issue of reasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter. (*Armstrong* v. *Francis Corp.* (1956) *supra,* 20 N.J. 320.) It is properly a consideration in land development problems whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters. [Citation.] The gravity of harm is its seriousness from an objective viewpoint, while the utility of conduct is meritoriousness from the same viewpoint. (Rest., Torts, § 826.) If the weight is on the side of him who alters the natural watercourse, then he has acted reasonably and

without liability; if the harm to the lower landowner is unreasonably severe, then the economic costs incident to the expulsion of surface waters must be borne by the upper owner whose development caused the damage. If the facts should indicate both parties conducted themselves reasonably, then courts are bound by our well-settled civil law rule." (64 Cal.2d at p. 410.)

As we have shown above, however, the "well-settled civil law rule" dictates a different result for riparian owners than that applicable to upland owners. Under the *Keys* v. *Romley* rule, if both parties act reasonably with respect to draining surface waters onto adjacent property the upper owner will be liable for damage caused by the alteration of the natural flow of the water. The result will differ in disputes between riparian owners, each of whom acts reasonably. The civil law rule with respect to natural watercourses, unlike that applicable to draining surface waters onto adjacent property, immunizes the upper riparian owner for damage caused by the alteration of the natural discharge of surface water into a watercourse and by improvements in the stream bed. Therefore, if the upper owner acts reasonably, or if the lower owner has not acted reasonably to protect the property, the lower riparian owner must continue to accept the burden of damage caused by the stream water.

■ As we noted earlier, however, the reasonableness of a landowner's action in discharging surface water runoff into a natural watercourse or in altering the watercourse itself cannot be determined in isolation. An owner in the lower reaches of a natural watercourse whose conduct has a relatively minor impact on the stream flow in comparison with the combined effect of actions by owners in the upper reaches of the watercourse may not be held liable for any damage caused by the stream flow beyond the proportion attributable to such conduct. If the rule were otherwise, owners at the lowest reaches of a watercourse could preclude development of upstream property by imposing on a single upstream owner the cost of all damage caused by the addition of surface water runoff if that addition combined with the existing stream flow damaged the lowest properties. The purpose of both the civil law rule creating immunity for damage caused by surface water runoff onto adjacent property and the natural watercourse rule which imposed the burden of damage caused by upstream development on the downstream owner was to ensure that development of property would not be foreclosed by imposition of liability for damage caused by changes in the treatment of surface water occasioned by that development. *Keys* v. *Romley* and the application of the rule of reasonableness to natural watercourses further that purpose. The rules applicable to surface water runoff onto adjacent property or into a natural watercourse have been modified only by limiting the immunity created by the civil and common law rules to conduct that is reasonable.

 The trial court and the Court of Appeal thus erred in concluding that the natural watercourse rule immunized defendants from tort liability as landowners for damage caused by their discharge of surface water runoff into Reliez Creek regardless of the reasonableness of their conduct. We shall nonetheless affirm the judgment of the Court of Appeal. Even were we to assume that the evidence would support a finding that increased surface water runoff or altered discharge of surface water runoff caused by improvements on any defendant's property was a substantial cause of the damage to plaintiffs' properties, plaintiffs have not established that defendants acted unreasonably in the construction of improvements or alteration of the method of discharge of the runoff; nor have plaintiffs established that they acted reasonably to protect their properties from stream-caused damage.

## V

### INVERSE CONDEMNATION

The Court of Appeal held that substantial evidence supported the trial court's conclusion that Reliez Creek was not a public improvement because respondents had not exercised control over the creek, had not erected structures other than the Sizeler outfall and sheet pile structure in it, and had not accepted the dedicated storm drainage easements. Therefore, the court held, notwithstanding the increased runoff into Reliez Creek caused by defendants' streets, roads, and other public works, the natural watercourse rule also immunized respondents from liability in inverse condemnation for the damage to plaintiffs' property. It did so because at common law a governmental entity, like a private party, had a right to collect surface waters on its land and discharge them into a natural watercourse.

Plaintiffs dispute both the conclusion that defendants could not be liable in inverse condemnation even if defendants' use of Reliez Creek to drain their roads and other public works was unreasonable, and the conclusion that defendants' actions with respect to the creek did not cause it to become a public work. Moreover, they argue, the question of public use is one to be decided as a matter of law by the appellate court, and the Court of Appeal erred in applying a substantial evidence standard of review. Finally, they argue that the Court of Appeal erred in holding that there can be no recovery against a public entity whose conduct contributed to the damage unless the plaintiff establishes the proportionate share of damage caused by that entity.

We agree with the Court of Appeal that plaintiffs' evidence did not establish that Reliez Creek had become a public work. We also agree that none of the defendants is liable in inverse condemnation for the damage to

plaintiffs' properties. We reach that conclusion for reasons which differ from those on which the Court of Appeal relied, however, and hold that a governmental entity may, if it acts unreasonably, be liable in inverse condemnation for damage caused by its discharge of surface water runoff from property which it has improved into a natural watercourse. Again, however, plaintiffs have not established that the damage to their properties was the result of unreasonable conduct by any of the defendants, individually or collectively.[18]

## A. *Conditional Privilege.*

 Article I, section 19 of the California Constitution permits private property to be "taken or damaged for public use only when just compensation . . . has first been paid to, or into court for, the owner." When there is incidental damage to private property caused by governmental action, but the governmental entity has not reimbursed the owner, a suit in "inverse condemnation" may be brought to recover monetary damages for any "special injury," i.e., one not shared in common by the general public. When adopted as section 14 of article I of the 1879 Constitution this provision was construed as providing a broader right of recovery against a governmental entity for damage to private property than that available in an action against a private party. It was not necessary to prove negligence or the commission of another tort by the government. (*Reardon* v. *City & County of San Francisco* (1885) 66 Cal. 492, 505 [6 P. 317].)

In the arcane world of water law, however, the theory prevailed that if a private party had the right to inflict the damage, the government could assert the same immunity. Thus, notwithstanding article I, section 14 (now section 19), there could be no recovery against a governmental agency for damage caused by draining surface water onto adjacent property or into a natural watercourse in circumstances in which a private property owner had the right to do so. If the injury was *damnum absque injuria* as between private parties,

---

[18]The Court of Appeal also held that City had statutory immunity under Government Code section 818.4 for approving permits which allowed upstream development to occur. Plaintiffs argue that the holding overlooks exceptions to that immunity for dangerous conditions on public property. We understand their argument to be that, because upstream development permitted by City has resulted in a dangerous condition of public property, the public entity is not immune for damage caused by that dangerous condition. The Court of Appeal did not hold otherwise. It correctly stated the statutory rule that a public entity is not liable for injury caused by the issuance of a permit.

The Court of Appeal did not address plaintiffs' argument that public roads and surfaces impervious to water, which increased surface water runoff into a natural watercourse, were a "dangerous condition" which contributed to plaintiffs damage. Our conclusion that plaintiffs failed to establish damage caused by unreasonable conduct of defendants in permitting the increased runoff makes it unnecessary to address that argument here.

it was so when the government caused it. (*San Gabriel V.C. Club* v. *Los Angeles, supra,* 182 Cal. 392, 406.)

The injury was also considered *damnum absque injuria* if the governmental entity was acting in the proper exercise of its police powers, as when it acted to prevent future flood damage. "Where the police power is legitimately exercised, uncompensated submission is exacted of the property owner if his property be either damaged, taken, or destroyed. In the exercise of the power of eminent domain, compensated obedience for the taking or damaging of his property is the owner's constitutional right. [¶] . . . But while it is unquestionably true that the addition of the word 'damaged' to our constitutional law governing the exercise of the right of eminent domain gives in many instances a right to compensation which did not formerly exist, it did not, touching the exercise of the police power, give a right of action for damages which theretofore were *damnum absque injuria.*" (*Gray* v. *Reclamation District No. 1500* (1917) 174 Cal. 622, 640-641 [163 P. 1024].)

This understanding of former section 14 of article I of our Constitution prevailed at the time *Archer* reached this court. There the court invoked the *damnum absque injuria* rule to relieve defendants from liability for the flooding caused by their alterations in the upstream drainage pattern and improvements in the watercourse. The court did so on the ground that a lower owner had no right to recover for damage caused by improvements constructed in a natural watercourse for the purpose of draining and protecting upper lands, and on the ground that defendants' conduct was a proper exercise of the police power. The court unnecessarily and inexplicably also held that former section 14 of article I: "[P]ermits an action against the state, which cannot be sued without its consent. It is designed, not to create new causes of action, but to give a remedy for a cause of action that would otherwise exist." (*Archer, supra,* 19 Cal.2d 19, 24.)

*Reardon* v. *City & County of San Francisco, supra,* 66 Cal. 492, was not mentioned by the *Archer* court, which, based on its novel construction of former section 14 of article I, then held that plaintiffs could not recover because the governmental defendants could not be found negligent for doing what they had a right to do even if the damage they caused could have been avoided. (*Archer, supra,* 19 Cal.2d at pp. 25-26.) Thus, under *Archer,* former section 14 of article I mandated compensation only if plaintiffs could have made out a case in negligence against a private owner. That they could not do, since defendants were riparian owners who had a right to drain surface waters into a natural watercourse even if the additional waters exceeded the capacity of the outlet.

The *Reardon* construction of former section 14 of article I was given new life by this court in *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250 [42 Cal.Rptr. 89, 398 P.2d 129] (*Albers*). That case did not invoke any water law principles, however, and for that reason the court concluded that it was not necessary in that case to choose between the extremes of the *Reardon* rule of liability and the *Archer* rule of nonliability. (*Id.,* at p. 261.) Nonetheless, the court did clarify that, "with the exceptions stated in *Gray* [v. *Reclamation District No. 1500, supra,* 174 Cal. 622], and *Archer, supra,*[19] any actual physical injury to real property proximately caused by the [public] improvement as deliberately designed and constructed is compensable under article I, section 14, of our Constitution whether foreseeable or not." (*Id.,* at pp. 263-264.) Not to allow such recovery, the court recognized, would compel " 'the owner of the damaged property . . . [to] contribute more than his proper share to the public undertaking.' " (*Id.,* at p. 263.)[20]

The Court of Appeal, and defendants, conclude that *Albers, supra,* 62 Cal.2d 250, and cases subsequently decided in which the *Archer* exception to inverse condemnation liability has been noted, establish the continued viability of the rule that a public agency incurs no liability for damage caused by discharge of surface waters into a natural watercourse regardless of the reasonableness of the manner in which the agency acts or the damage it inflicts on lower riparian properties. That assumption is unwarranted.

The general rule of *Albers* and the policy underlying former section 14 of article I were reaffirmed in *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 303: "As the *Albers* opinion carefully made clear, its general rule of compensability did not derive from statutory or common law tort doctrine, but

---

[19]*Gray* v. *Reclamation District No. 1500, supra,* 174 Cal. 622, like *Archer,* held that there was no right to recover in inverse condemnation for damages which were *damnum absque injuria* prior to the addition to former section 14 of article I of a right to compensation for property damage. Thus damages resulting from a proper exercise of the police power, and not the power of eminent domain, were not compensable. (174 Cal. at pp. 640-641.)

[20]The *Albers* view of former section 14 of article I, and our conclusion here that public entities may be liable for downstream damage under present section 19, are wholly consistent with, and carry out the intent of, the delegates to the 1878-1879 constitutional convention.

The initial draft of former section 14 did not include the "or damaged" provision. That provision was added by an amendment offered by delegate Hager who, like delegate Estee who spoke in support of the amendment, believed that "a man should not be damaged without compensation." (3 Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1190.) The example of damage relied on in support of the amendment was an incident in San Francisco when, pursuant to legislative authorization, Second Street was cut, leaving adjacent homes "high in the air, and wholly inaccessible." (*Ibid.*)

The only argument in opposition to the amendment was that the measure was untried and might be construed to compel compensation of lost profits if a road were moved. There is no suggestion in the debate on the measure that the delegates anticipated that immunity would exist for damage inflicted in any exercise of the police power or that a *damnum absque injuria* doctrine would immunize a governmental entity.

instead rested on the construction, 'as a matter of interpretation and policy' (62 Cal.2d at p. 262), of our constitutional provision. The relevant 'policy' basis of article I, section 14, was succinctly defined in *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 642 . . . : 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary—condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements' [citation]: 'to socialize the burden . . . —to afford relief to the landowner in cases in which it is unfair to ask him to bear a burden that should be assumed by society' [citation]."

Like *Albers, Holtz* did not involve the natural watercourse rule. Therefore, while we noted the recognition in past cases of an exception for exercise of the police power and the *Archer* exception for activities which were *damnum absque injuria* at common law (*Holtz* v. *Superior Court, supra,* 3 Cal.3d at pp. 305-306), we had no occasion in *Holtz* to consider the application of former section 14 of article I of the California Constitution beyond the facts of the case before us which involved excavations that withdraw lateral support from adjacent property. ( 3 Cal.3d 296, 304, 307-308.) However, we expressly rejected the argument that a public agency could not be liable if it had a "right' to inflict such damage. That interpretation of the 'right' referred to in the *Archer* exception . . . would so expand the exception as to consume the general *Albers* rule." (*Id.,* at p. 306.) *Holtz,* therefore, does not stand for the proposition that the "common law 'right to inflict damage,' emanating from the complex and unique province of water law," (*ibid.*) continues to protect public agencies.

If anything, *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, called into question the broad proposition for which defendants argue. "In some ways the language of the 'right to inflict damage' projects a misleading concept, because the essential common characteristic of this category of cases is not that they all involve the infliction of injury on others, but rather that they all involve injury resulting from the landowner's efforts to protect his own property from damage." (3 Cal.3d at pp. 306-307.) This, of course, is not a case in which defendants' activities in discharging surface water runoff into Reliez Creek in the manner alleged resulted simply from efforts to protect their own properties from damage. The activities to which the court referred in *Holtz* were in-stream improvements undertaken by riparian owners to protect their land against the stream. (*Id.,* at p. 307, fn. 11.)

More recently we acknowledged the *Archer* exception in *Belair* v. *Riverside County Flood Control Dist., supra,* 47 Cal.3d 550. There, significantly,

the activity for which plaintiffs sought to hold the public agencies liable in inverse condemnation was the construction of flood control levees on the banks of natural watercourses. The impact of three of the levees was to undermine a fourth, causing that levee to give way, flooding the properties of plaintiffs, not all of whom were riparian owners apparently. Discussing *Albers* and *Holtz* we emphasized again that the " 'doctrine of the common law "right to inflict damage," emanating from the complex and unique province of water law, has been employed in only a few restricted situations, generally *for the purpose of permitting a landowner to take reasonable action to protect his own property from external hazards such as floodwaters.*' " (*Belair* v. *Riverside County Flood Control Dist., supra,* 47 Cal.3d 550, 563-564, italics in original.) We held, moreover, that even such in-stream improvements for flood control purposes should not be cloaked with the same immunity as that which a private owner could claim. If the public agency acted unreasonably in the design, construction, or maintenance of the improvements, it would be liable in inverse condemnation for damage resulting from the failure of the project. (*Id.,* at p. 565.)

*Belair* thus signalled not the continuation of the *Archer* exception, but its demise. It survived only vestigally in the limitation of inverse condemnation liability for public flood control projects in natural watercourses to damage resulting from a public entity's *unreasonable* conduct. Thereafter, a public agency that acted unreasonably in regard to its use or alteration of a natural watercourse might be liable in inverse condemnation for downstream damage.

Because *Belair* involved only flood control projects, however, and we had acknowledged in *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, that exceptions to inverse condemnation liability have been recognized for "privileged" activities, some lower courts have continued to apply the *Archer* exception to inverse condemnation liability in other cases in which a public agency invoked the natural watercourse rule.

While we did not decide in *Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 307, whether the natural watercourse rule was such a privilege, we did note that the *Archer* exception was not necessarily an absolute privilege. We now hold that the privilege to utilize a natural watercourse for drainage of surface waters from improved public property and to make improvements in or alterations to a natural watercourse for the purpose of improving such drainage is a conditional privilege, not an absolute privilege. If an absolute privilege existed, downstream owners could be forced to bear a disproportionate share of the burden of improvements undertaken for the benefit of the public at large. A public agency may not impose on other riparian owners

the burden of avoidable downstream damage if alternative or mitigating measures are available and the agency acts unreasonably in failing to utilize them. The privilege is conditional, however, in recognition that riparian property is subject to the natural watercourse rule as modified by the rule of reasonableness.

The Court of Appeal erred, therefore, in holding that a public entity may not be found liable in inverse condemnation for damage to private property caused by the manner in which surface water runoff from its property is discharged into a natural watercourse. Today neither a private owner nor a public entity has the right to act unreasonably with respect to other property owners. Neither may disregard the interests of downstream property owners, and a public entity may no longer claim immunity in tort or inverse condemnation actions.

This is not to say that public entities incur absolute liability for any damage caused by the runoff of surface water from improvements on its property into a natural watercourse or from public improvements constructed in or on a watercourse. Again, as we held in *Belair* v. *Riverside County Flood Control Dist.*, *supra*, 47 Cal.3d 550, with respect to flood control projects, the public agency is liable only if its conduct posed an unreasonable risk of harm to the plaintiffs, and that unreasonable conduct is a substantial cause of the damage to plaintiff's property. The rule of strict liability generally followed in inverse condemnation (see *Albers, supra*, 62 Cal.2d 250, 263-264) is not applicable in this context.

Because a public agency, like any riparian property owner, engages in a privileged activity when it drains surface water into a natural watercourse or makes alterations to the watercourse, article I, section 19 of the California Constitution mandates compensation only if the agency exceeds the privilege by acting unreasonably with regard to other riparian owners.

B. *Reasonable Conduct Standards.*

The reasonableness of the public agency's conduct must be determined on the facts of each case, taking into consideration the public benefit and the private damages in each instance. (*Keys* v. *Romley, supra*, 64 Cal.2d at pp. 409-410.) We note initially that runoff which would occur regardless of improvements on publicly owned property is not a basis for liability unless by collecting and discharging that runoff in an unreasonable manner, the improvement causes downstream property damage. Inverse condemnation liability ultimately rests on the notion that the private individual should not be required to bear a disproportionate share of the costs of a public improvement. Moreover, whether compensation must be paid for damages caused by

alterations in the flow of a natural watercourse involves a balancing of interests. When the agency has acted unreasonably, compensation "constitutes no more than a reimbursement to the damaged property owners of their contribution of more than their 'proper share [to] the public undertaking.' " (*Belair* v. *Riverside County Flood Control Dist., supra*, 47 Cal.3d 550, 566.)

The factors which the court identified as important in imposing liability in *Albers, supra*, 62 Cal.2d 250, 263, are also important here: "First, the damage to th[e] property, if reasonably foreseeable, would have entitled the property owners to compensation. Second, the likelihood of public works not being engaged in because of unseen and unforeseeable possible direct physical damage to real property is remote. Third, the property owners did suffer direct physical damage to their properties as the proximate result of the work as deliberately planned and carried out. Fourth, the cost of such damage can better be absorbed, and with infinitely less hardship, by the taxpayers as a whole than by the owners of the individual parcels damaged. Fifth, . . . 'the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' "

As in *Belair* v. *Riverside County Flood Control Dist., supra*, 47 Cal.3d 550, 565-566, however, inverse condemnation liability for damage caused by drainage of surface waters into or alteration of a natural watercourse is limited to situations in which the public entity's unreasonable conduct constitutes a substantial cause of the damage suffered by property owners. As with tort liability discussed above, only damage caused by the improvement must be compensated. Therefore, if the cause of the damage is claimed to be addition of surface water runoff from public improvements such as roads to the stream flow, a public agency is liable only for the proportionate amount of damage caused by its actions. And, because strict liability would discourage construction of needed public improvements which affect surface water drainage, liability exists only if the agency acts unreasonably, with reasonableness determined by balancing the public benefit and private damage in each case.

*Keys* v. *Romley, supra*, 64 Cal.2d 396, identified the basic requirements of reasonable conduct in this context. After that decision standards for balancing the interests of riparian landowners and assessing reasonableness in inverse condemnation actions have been proposed by a leading commentator, Professor Arvo Van Alstyne. (Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431.) Those standards, which amici curiae urge the court to adopt, require consideration of several factors:

(1) The overall public purpose being served by the improvement project; (2) the degree to which the plaintiff's loss is offset by reciprocal benefits; (3)

the availability to the public entity of feasible alternatives with lower risks; (4) the severity of the plaintiff's damage in relation to risk-bearing capabilities; (5) the extent to which damage of the kind the plaintiff sustained is generally considered as a normal risk of land ownership; and (6) the degree to which similar damage is distributed at large over other beneficiaries of the project or is peculiar only to the plaintiff.

Reasonableness in this context also considers the historic responsibility of riparian owners to protect their property from damage caused by the stream flow and to anticipate upstream development that may increase that flow. Keeping in mind the purpose of the constitutional right to compensation for damage caused by public works and improvements—that property owners contribute no more than their proper share to the public undertaking—plaintiff must demonstrate that the efforts of the public entity to prevent downstream damage were not reasonable in light of the potential for damage posed by the entity's conduct, the cost to the public entity of reasonable measures to avoid downstream damage, and the availability of and the cost to the downstream owner of means of protecting that property from damage.

VI

LIABILITY OF DEFENDANTS

A. *Status of Reliez Creek as Public Work.*

 Plaintiffs contend that the evidence they presented established that Reliez Creek has itself become a public work and, for that reason, City is liable in inverse condemnation for any damage it inflicts on their property. They argue that the Court of Appeal erred both in analyzing this claim under a substantial evidence standard of review, failing to recognize that public use is a question of law, and in concluding that City had not exercised control over the creek.

 When trial is to the court, Code of Civil Procedure section 631.8 permits the court to grant a motion for judgment made by the defendant after plaintiff has completed presenting evidence. Since the trial court must weigh the evidence and may draw reasonable inferences from that evidence, such rulings are normally reviewed under the substantial evidence standard, with the evidence viewed most favorably to the prevailing party. However, if the facts are undisputed the reviewing court may make its own conclusions of law based on those facts. It is not bound by the trial court's interpretation. (*Torrey Pines Bank* v. *Hoffman* (1991) 231 Cal.App.3d 308 [282 Cal.Rptr. 354].) Public use is a question of law, however, and, when the factual issues

on which that question turns have been resolved, must be decided by the court.

The Court of Appeal stated the standard as simply one according deference to the findings of the trial court, which are to be upheld if supported by substantial evidence. Nonetheless, we agree with the conclusion that plaintiffs did not establish that defendants, or any of them, exercised control over Reliez Creek and thereby transformed it into a public work or improvement. The evidence did not establish either an express or an implied acceptance of the drainage easements.[21] The evidence that on occasion City assisted residents by removing fallen trees from the creekbed, on request of the owners and with permission to cross their property in doing so, would not support an inference that City was exercising control over the watercourse. The contrary is the more reasonable inference. Repair of the Sizeler outfall was not an exercise of authority over the creekbed itself except insofar as City held an easement for the outfall.

The evidence did not establish an exercise of control by any of the remaining defendants. County and District assisted the private riparian owners in obtaining federal financing and in design of the sheet pile structure, but those owners acknowledged responsibility for the structure. The public entities' sponsorship was required to obtain financing, but no intent to exercise control or to incorporate the creek into a unified public drainage system is reflected by that involvement. The evidence that CalTrans constructed a box culvert in the creekbed viewed in light of the purpose for which it was constructed—to support the roadbed for Highway 24, which would otherwise have collapsed into the creekbed—and the effort to dissipate any increase in volume and velocity of the stream water demonstrate an intent to avoid interference with the creek, not to exercise control over it.

Utilizing an existing natural watercourse for drainage of surface water runoff and requiring other riparian owners to continue to do so does not transform the watercourse into a public storm drainage system. A governmental entity must exert control over and assume responsibility for maintenance of the watercourse if it is to be liable for damage caused by the streamflow on a theory that the watercourse has become a public work. (See, e.g., *Souza* v. *Silver Development Co.* (1985) 164 Cal.App.3d 165 [210 Cal.Rptr. 146].)

---

[21]We question, moreover, whether requiring and/or accepting drainage easements across private property to a privately owned natural watercourse is evidence of an exercise of control over the watercourse itself. The requirement may reflect nothing more than a precaution necessary to ensure that drainage of surface waters into the watercourse is not cut off by the improvements.

We conclude, therefore, that regardless of the standard of review the Court of Appeal applied, it correctly upheld the trial court's rejection of plaintiffs' claim that Reliez Creek has become a public work or improvement, or has been incorporated into City's drainage system. It remains a privately owned natural watercourse.

### B. *Liability of City, CalTrans, and BART.*

The Court of Appeal held that, assuming the natural watercourse rule did not shield defendants, plaintiffs could not prevail insofar as they sought recovery from CalTrans and BART (which was a defendant only in the inverse condemnation cause of action) because they failed to establish that the facilities of these defendants were a substantial concurring cause of the downstream property damage and did not negate the possibility that urbanization generally would have resulted in the damage suffered by plaintiffs regardless of the actions of these defendants.[22] The facilities owned by CalTrans and BART, the court reasoned, had been completed 14 years before the 1981-1982 storms, at a time when the watershed from which the runoff originated was less developed. Defendants could not be liable for damage occurring subsequently when third parties over whom the defendants had no control added additional runoff to the stream.

The trial court also found, and the Court of Appeal agreed, that plaintiffs' evidence was insufficient to establish that, assuming those defendants could be held liable for damage caused by discharge of surface water runoff into Reliez Creek, either CalTrans or BART was a substantial concurring cause of the damage suffered by plaintiffs.

The evidence showed that BART owns only 3.5 acres in the Reliez Creek watershed. CalTrans occupies 22.4 acres. Together these entities occupy 25.9 acres or 1.1 percent of the watershed, and accounted for approximately 9.2 percent of the increase in surface water runoff over that which would have occurred even absent development or improvement of the property. The combined contribution of BART and CalTrans to the increased runoff due to urbanization in a 100-year storm, however, would be 6.7 percent of the total increase attributable to urbanization, and in a 2-year storm would be 7.2 percent. Those defendants would contribute less than 1 percent of the peak flow in a 100-year storm. The trial court concluded, based on these figures, that BART was responsible for only 0.02 percent of the runoff.

---

[22]The Court of Appeal reached a similar conclusion with respect to City, County, and District, reasoning that there was no evidence that City maintained any structures which were a substantial concurring cause of the damage.

The trial court and the Court of Appeal concluded that the evidence did not support the opinion of plaintiffs' experts that the runoff generated by these defendants' improvements was a substantial cause of plaintiffs' damage. They reasoned that the facilities of these defendants had been in place for 14 years at that time, during which period there had been no creekside damage attributable to those facilities. These defendants had constructed a structure engineered to dissipate the velocity and energy of the water which was channeled through their culvert above Condit Road. One of plaintiffs' experts inspected the creekbank between Condit Road and the culvert in the mid-1980's and found it to be completely different from the bank below the road with little evidence of bank failure.

The expert was less positive as to whether the damage would have occurred without the contribution of both BART and CalTrans to the stream flow, but plaintiffs also failed to establish the proportion of damage attributable to CalTrans runoff from CalTrans property. Therefore, the Court of Appeal held, even assuming that together the BART/CalTrans runoff caused part of the damage,[23] there was no basis in the evidence for a determination of CalTrans or BART share of liability.

Plaintiffs argue that the failure to apportion responsibility for the damage is irrelevant because defendants are subject to joint and several liability. ▪ We have held otherwise, however, with respect to apportionment of liability for damage caused by drainage of surface waters. In *Mehl* v. *People ex rel. Dept. Pub. Wks.* (1975) 13 Cal.3d 710, 718 [119 Cal.Rptr. 625, 532 P.2d 489], we held that a plaintiff in inverse condemnation must establish the proportion of damage attributable to the public entity from which recovery was sought. Because the plaintiff did not differentiate the damage allegedly caused by runoff from a state freeway, from that caused by natural flow and by the county's efforts to deal with increased flow, we reversed the judgment stating: "In these circumstances, it [is] essential to differentiate between the responsibility of the state and the county for the overall damage." (*Ibid.*)

▪ Moreover, even were we to assume that the evidence was sufficient to establish that increased runoff from the property of either of these defendants was a substantial cause of plaintiffs' damage and to permit an apportionment, plaintiffs' failure to demonstrate that these defendants acted unreasonably, or that plaintiffs themselves acted reasonably to protect their property, precludes recovery.

---

[23]This expert testified that in a 100-year storm, the combined CalTrans/BART contribution to the stream flow would be less than 1 percent (.93 percent). Its impact on stream velocity was "small."

City is liable under section 19 of article I of the California Constitution for the damage suffered by plaintiffs only if the additional surface water runoff created by its improvements, i.e., paved streets and other public areas, or the manner in which it collected and discharged surface water runoff into Reliez Creek was both unreasonable and a substantial cause of the damage to plaintiffs' property. The evidence does not support a finding of liability under those criteria. Plaintiffs did offer expert testimony that runoff from City streets was a substantial cause of the creekside damage. However, there is no evidence that City acted unreasonably in the construction of its improvements and, significantly, no evidence that plaintiffs themselves took reasonable measures to prevent the erosion of their creek banks. Therefore, assuming that the evidence would support inferences favorable to plaintiffs with regard to the cause of their injury, they cannot prevail on their tort causes of action against City.

That being so, we need not consider here whether a riparian property owner who has altered the natural drainage has a continuing obligation to monitor the impact of the runoff from the property as urbanization occurs, and, if necessary, to take steps to avoid damage if the changed conditions indicate that the runoff may be a substantial cause of future damage.

C. *Liability of County and District.*

Plaintiffs claim that the Court of Appeal also erred in upholding the nonsuit granted County and District by the trial court on the ground that neither owned or exercised control over any of the public works that may have contributed to plaintiffs' damage. They note that there was evidence that County maintained at least one road in the watershed that drained into Reliez Creek as late as 1980, and argue further that ownership and control are not essential to their nuisance and trespass causes of action.

There is no error. Since the claim that Reliez Creek was part of a public drainage system fails, plaintiffs' alternative theory that discharge of surface water runoff into Reliez Creek caused their damage must be considered. Plaintiffs point to no evidence that county owned property abutting Reliez Creek at the time plaintiffs suffered damage, however, and District never owned any of the properties which drain into Reliez Creek. These defendants are not liable for damage caused by runoff from property owned by others (see *Preston* v. *Goldman* (1986) 42 Cal.3d 108, 125-126 [227 Cal.Rptr. 817,

720 P.2d 476]), and if the claim is that county is liable as a nonriparian owner for runoff from its roads which eventually reached Reliez Creek, it also fails. The evidence did not establish that any damage was attributable to that runoff. Neither of these defendants could be found liable for maintaining a dangerous condition on public property, or found to have interfered with plaintiffs' use and enjoyment of their property (Civ. Code, § 3479), or to have interfered with their exclusive possession by contributing to the stream bank erosion.

Therefore, while the Court of Appeal did not refer to the nuisance and trespass causes of action, it did not err in affirming the judgment for County and District. Giving plaintiffs' evidence all the weight to which it is entitled, and drawing all legitimate inferences favorable to plaintiffs from that evidence, it is not sufficiently substantial to support a verdict for plaintiffs on those causes of action. (See *Ewing* v. *Cloverleaf Bowl* (1978) 20 Cal.3d 389, 395 [143 Cal.Rptr. 13, 572 P.2d 1155].)

The same is true with regard to the theory urged in this court, that by enforcing a City ordinance governing drainage and contracting with City to undertake and/or advise on erosion control, District became responsible for plaintiffs' damage. Plaintiffs direct us to no evidence that tied any act of enforcement or performance of District's contract with City to the damages suffered by plaintiffs in 1981-1982.[24]

We also reject plaintiffs' argument that the Court of Appeal erred in holding that County is not subject to tort liability as a party exercising ownership and control of the creekbed. County's participation in sponsoring the application for federal funding of the sheet pile structure had no effect on ownership of the creekbed for purposes of establishing the tort liability of an owner of real property.

Finally, we note with regard to both tort and inverse condemnation liability that the evidence reflects no efforts by plaintiffs themselves to protect their properties once it became apparent that erosion of the creek bank was occurring.

---

[24]This conclusion makes it unnecessary to address plaintiffs' argument that the Court of Appeal failed to consider Government Code section 895.2, which imposes joint and several liability on governmental entities that cause injury for which they would incur liability under any other law while performing under an agreement between or among the governmental entities.

Furthermore, the relevance, if any, of Government Code section 895.5 was not raised by plaintiffs in the briefs they filed in the Court of Appeal.

## VII

### Costs

The trial court denied defendants' motion for an award of costs made pursuant to Code of Civil Procedure section 1032[25] and BART's request for an award of attorney fees under Code of Civil Procedure section 1038. It ruled that under *Blau* v. *City of Los Angeles* (1973) 32 Cal.App.3d 77, 89 [107 Cal.Rptr. 727], costs could not be awarded on the inverse condemnation claim and defendants were unable to allocate their costs between the tort and inverse condemnation aspects of the action.

 The Court of Appeal, relying on cases decided subsequent to *Blau* v. *City of Los Angeles, supra,* 32 Cal.App.3d 77, including *City of Los Angeles* v. *Ricards* (1973) 10 Cal.3d 385 [110 Cal.Rptr. 489, 515 P.2d 585], and *Smith* v. *County of Los Angeles* (1989) 214 Cal.App.3d 266, 272 [262 Cal.Rptr. 754], held that there is no constitutional bar to assessment of costs against an unsuccessful inverse condemnation plaintiff. Plaintiffs claim that the court erred in this holding and that article I, section 19, and public policy preclude an assessment of costs against a party who initiates an inverse condemnation action in good faith to recover for loss or damage to property.

Plaintiffs reason that, since the right to bring an inverse condemnation action is subsumed within the right to just compensation (*Rose* v. *State* (1942) 19 Cal.2d 713, 719-724 [123 P.2d 505]), one who is forced to initiate a suit to enforce the right to compensation may not be burdened with the state's costs if the suit, although in good faith, is unsuccessful. Just as a defendant in an action for eminent domain is entitled to costs in defending the action, the plaintiff in inverse condemnation must be free of expenses imposed as a result of exercising rights granted by article I, section 19.

 A property owner's right to the costs of defending an eminent domain action is well established. "To require the defendants . . . to pay any portion of their costs necessarily incidental to the trial of the issues on their part, or any part of the costs of the plaintiff, would reduce the just compensation awarded by the jury, by a sum equal to that paid by them for such costs." (*San Francisco* v. *Collins* (1893) 98 Cal. 259, 262 [33 P. 56].) The costs which may be recovered include those associated with unsuccessful defenses if raised in good faith (*San Joaquin etc. Irr. Co.* v. *Stevinson* (1913) 165 Cal. 540, 542 [132 P. 1021]), and even the cost of an unsuccessful

---

[25]Code of Civil Procedure section 1032, subdivision (b), provides that "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."

appeal from an order awarding the plaintiff a new trial on damages has been recognized as a recoverable expense. (*San Diego Land etc. Co.* v. *Neale* (1891) 88 Cal. 50, 67-68 [25 P. 977].) A plaintiff in inverse condemnation is also entitled to costs on proof that he suffered damage even though offsetting benefits from a public project bar recovery of monetary damages. (*Collier* v. *Merced Irr. Dist.* (1931) 213 Cal. 554, 572 [2 P.2d 790].)

More recently this court confirmed the right of a partially successful inverse condemnation plaintiff to costs in *City of Los Angeles* v. *Ricards, supra,* 10 Cal.3d 385. There for two years the plaintiff was deprived of the use of a bridge which afforded access to plaintiff's property. We reversed a judgment awarding her the full value of the property, but held that plaintiff was nonetheless entitled to costs because there had been some damage, "however minimal." We also stated, in dictum, a rule denying costs to unsuccessful inverse condemnation plaintiffs: "Property owners are, of course, not constitutionally entitled to costs in inverse condemnation actions if they are unable to prove that there has been a taking or damaging of their property by the defendant governmental entity. (*Crum* v. *Mt. Shasta Power Corp.* (1932) 124 Cal.App. 90 . . . .) In such a circumstance the constitutional doctrine of full compensation underlying the award of costs is plainly inapplicable to owners who initiated the unsuccessful litigation." (*Id.,* at p. 391.)

Under the rules established by these cases it is clear that defendants' costs may not be imposed on an inverse condemnation plaintiff in any case in which the plaintiff demonstrates that the actions of a governmental entity damaged the plaintiff's property. ▮▮▮ Plaintiffs here do not fall within the rules of *City of Los Angeles* v. *Ricards, supra,* 10 Cal.3d 385, 391, and *Collier* v. *Merced Irr. Dist, supra,* 213 Cal. 554, 572, however. Even assuming they proved damage, it was not compensable damage absent proof that the defendants' actions were unreasonable and that plaintiffs themselves acted reasonably to prevent the damage.

Faced with a similar issue, the Court of Appeal applied the rule proposed in *City of Los Angeles* v. *Ricards, supra,* 10 Cal.3d 385, 391, granting costs to a defendant in an inverse condemnation action in whose favor judgment had been entered. (*Smith* v. *County of Los Angeles* (1989) 214 Cal.App.3d 266, 297 [262 Cal.Rptr. 754].) The court rejected a contrary holding in *Blau* v. *City of Los Angeles, supra,* 32 Cal.App.3d 77, and *Drennen* v. *County of Ventura* (1974) 38 Cal.App.3d 84 [112 Cal.Rptr. 907], concluding that the authority on which they relied did not support a conclusion that there is a constitutional right to be free of costs in litigating the issue of whether action of the governmental entity damaged an inverse condemnation plaintiff's property.

The *Blau* court relied on this court's holding in *In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21 [37 Cal.Rptr. 74, 389 P.2d 538], in which we reaffirmed the right of a property owner to recover costs related to issues that are justifiably raised, but prove unmeritorious. "Public use is, however, one of the issues which owners reluctant to give up their property may justifiably raise in eminent domain proceedings as well as in actions in inverse condemnation or 'in the nature of eminent domain.' Even though they may not prevail on this issue in either the trial court or on appeal, it appears from the most recent expressions of the court that they are entitled to be free from costs in litigating it." (61 Cal.2d at p. 71.)

We agree with the conclusion of the Court of Appeal in *Smith v. County of Los Angeles, supra,* 214 Cal.App.3d 266, that *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, does not support a conclusion that inverse condemnation plaintiffs are entitled to be free of costs in any case in which their action is brought in good faith. There the parties against whom costs had been assessed were property owners who challenged a redevelopment plan, claiming that the purpose was not a "public use." They were unsuccessful, with the result that this issue could not be raised in subsequent condemnation proceedings. For that reason we held that the public use aspect of the proceeding was equivalent to an eminent domain proceeding and that no costs could be assessed against the property owners. In that case, as in *City of Los Angeles v. Ricards, supra,* 10 Cal.3d 385, and *Collier v. Merced Irr. Dist., supra,* 213 Cal. 554, a compensable taking would have been established had the property owners been successful.

An inverse condemnation plaintiff must establish a compensable taking or damage before article I, section 19 of the California Constitutition may be invoked to shield the unsuccessful plaintiff from assessment of costs under Code of Civil Procedure section 1032. Nothing in the constitutional provision or our past cases suggests that a governmental entity must bear the expense of all litigation by property owners who in good faith, but without sufficient evidentiary or legal support, claim damage to their property.

The statutory power of a court to impose costs of litigation on an unsuccessful party in a civil action is limited by article I, section 19 (*San Francisco v. Collins, supra,* 98 Cal. 259, 262), but that provision comes into play only when property is taken for public use or damaged by a public entity. It is not enough that the plaintiff believes that eminent domain principles are applicable to the claim. Neither sound public policy nor protection of property owners' rights under article I, section 19 of the California Constitutition suggests that public funding of inverse condemnation actions is necessary if the plaintiff fails to establish a compensable taking or damage.

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., Arabian, J. and George, J., concurred. Panelli, J.,* concurred in the judgment.

**MOSK, J.**—I concur in the holding and much of the reasoning of the majority. The majority correctly adopt the requirement that upstream and downstream riparian owners act reasonably, in the same manner in which the reasonableness requirement for the discharge of surface waters was explicitly recognized in *Keys* v. *Romley* (1966) 64 Cal.2d 396, 409-410 [50 Cal.Rptr. 273, 412 P.2d 529]. I write separately merely to clarify the issue of inverse condemnation liability with respect to the City of Lafayette (City) and the California Department of Transportation (Caltrans).

In this case, plaintiffs offered expert testimony that runoff from City streets, and from Highway 24 operated by Caltrans, was a substantial cause of increased flow of Reliez Creek and of the resultant flooding. Such evidence would ordinarily be significant enough for us to remand the case to the trial court for a full adjudication of the causation issue. However, as the majority rightly conclude, plaintiffs failed to prove the other elements necessary for making their case: that the public entities acted unreasonably, and that plaintiffs took reasonable measures to protect their own property.

The lack of such evidence of reasonableness in this particular case, however, should not mislead public entities. Today's opinion, in adopting a reasonableness requirement for upstream riparian owners, and in reaffirming the cost-spreading rationale behind inverse condemnation liability, clearly puts public entities on notice that they are responsible for monitoring and mitigating the effects of the cumulative development of streets and highways on downstream riparian owners.

According to the principles enunciated by the majority today, downstream property owners would be able to prevail against a public entity in inverse condemnation liability if they are able to show: (1) that runoff from public streets and highways substantially contributed to the damage of the downstream owners' property; (2) that the owners took reasonable measures to protect their own property; and (3) that the public entities responsible for the streets and highways failed to adopt reasonable measures to mitigate the foreseeable effects of such development. The precise meaning of "reasonable" mitigation measures in this context remains to be delineated on a case-by-case basis.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

Nonetheless, the majority claim that they refrain from deciding "whether a riparian property owner who has altered the natural drainage has a continuing obligation to monitor the impact of the runoff from the property as urbanization occurs . . . ." (Maj. opn., *ante*, at p. 373.) It appears to follow inescapably from the principles of inverse condemnation liability reaffirmed by the majority, however, that when the riparian owner is a public entity, such an obligation to monitor does exist. Otherwise, downstream riparian owners would be compelled to pay a disproportionately high price for the cost of development of streets and highways in the form of damage to their property, and upstream public entities would be free of liability regardless of whether they could have taken reasonable mitigation measures to prevent foreseeable harm to downstream owners from cumulative development. Such a conclusion would be inconsistent with the cost-spreading rationale of inverse condemnation liability. (See *Holz* v. *Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441].) Nothing in the majority opinion should be interpreted to suggest the contrary.

Appellants' petition for a rehearing was denied April 13, 1994.